UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Miner, Ltd., | Case No. 24-CV-02677 (JMB/DLM) |
| Plaintiff, | |
| v. | **ORDER** |
| Shaun Nerby, | |
| Defendant. | |

Chad A. Snyder and Michael H. Frasier, Rubric Legal LLC, Minneapolis, MN, and Christen McGlynn (*pro hoc vice*) and Jiwon Juliana Yhee (*pro hoc vice*), Masuda, Funai, Eifert & Mitchell, Ltd., Chicago, IL, for Plaintiff Miner, Ltd.

Clayton Carlson, Haley-Rose Cassidy Severson, John Thomas Duffey, and Steven L. Schleicher, Maslon LLP, Minneapolis, MN, for Defendant Shaun Nerby.

This matter is before the Court on Plaintiff Miner, Ltd.'s (Miner) motion for a temporary restraining order (TRO)[1] against Defendant Shaun Nerby for alleged trade secret misappropriation, breaches of certain non-compete, non-solicitation, and confidentiality provisions of his contract with Miner, tortious interference with contract, and tortious interference with prospective economic advantage, which conduct, Miner asserts, has caused it irreparable harm. (Doc. No. 21.) For the reasons discussed below, the Court denies the motion.

---

[1] The Court notes that Miner originally filed this motion as one for a TRO. (*See* Doc. No. 21; Doc. No. 25.) In its briefing, Miner also refers to this motion as a "motion for preliminary injunction." (Doc. No. 18 at 2.) Because the parties have had ample notice of the proceedings, and based on the relief sought by Miner, the Court construes this motion as a motion for a preliminary injunction under Federal Rule of Civil Procedure 65(a).

1

## BACKGROUND

### A.     Miner's Business

Miner provides products, systems, and services to the warehousing and materials-management operations industry. (Doc. No. 1 [hereinafter, "Compl."] ¶¶ 1, 17.)[2]  More specifically, it sells, designs, installs, leases, and services loading docks, commercial doors, and other related accessories. (*Id.* ¶ 1.) It also offers such services to its customers such as repairs, programming, asset management, installations, and safety and compliance testing and inspections. (*Id.* ¶ 18.)

Miner cultivates its relationships with its customers and vendors over the course of many years and, in doing so, gathers information about them that is not generally known. (*Id.* ¶¶ 20, 21, 22.) For example, Miner obtains the following client-related information: work history, lists, quoting schemes, proprietary pricing metrics, contact information for representatives, among other information. (*Id.*) Likewise, Miner also obtains the following vendor information: vendor files, orders, order history, pricing, contact information, and other vendor-related information. (*Id.*) According to Miner, this information gives Miner a competitive edge in the relevant market. (*Id.*) For that reason, Miner protects certain customer and vendor information by limiting employees' access to this information. (*Id.* ¶ 23.) In addition, Miner requires that the employees who are granted access to this

---

[2] The Director of Operations at Miner, Lance Higgins, verified the factual allegations in the Complaint. (Compl. at 34; Doc. No. 38 [hereinafter, "Higgins Decl."] ¶¶ 3, 6.)

customer and vendor information must execute confidentiality and non-disclosure agreements. (*Id.*)

### B.  Nerby's Employment History with Miner

In April 2017, a company later acquired by Miner, Star Equipment, hired Nerby to work in the role of "Aftermarket Sales Representative." (Doc. No. 33 [hereinafter, "Nerby Decl."] ¶¶ 3, 8.) In that role, Nerby sold service and maintenance plans for loading docks, commercial garage doors, and related warehouse accessories to Miner's customers in southwestern Minnesota. (*Id.* ¶¶ 4, 6, 7.)

In October 2019, Miner acquired Star Equipment. (*Id.* ¶ 8.) Miner hired Nerby to work in the same role he had been in as a Star Equipment employee, now part of Miner's "Star Equipment business unit," which covered the Upper Midwest region. (*Id.* ¶ 9; Compl. ¶ 5.) As a condition of his employment with Miner, Nerby executed a Non-Competition, Non-Solicitation and Confidentiality Agreement (Agreement).[3] (Compl. ¶ 10, Ex. 4 [hereinafter "Agmt."].) In the Agreement, Nerby acknowledged that he would keep information about Miner's customers, vendors, and suppliers confidential. (Agmt. § 4.) Nerby also agreed that, during his employment with Miner and for two years following the date of the termination of his employment, he would not operate or participate in a competing business anywhere in the states of Minnesota, North Dakota, South Dakota, Wisconsin, or Iowa. (*Id.* § 3(a).) In addition, Nerby agreed not to solicit Miner's

---

[3] Nerby does not remember being asked to sign the agreement and does not recall any communication with Miner regarding the restrictive covenants. (Nerby Decl. ¶ 10.) Nerby's lack of a specific memory of signing the Agreement does not void its terms.

3

employees or customers for two years after termination. (*Id.* § 3(b), (c).) Nerby also "recognized and acknowledged" that Miner may seek injunctive relief to enforcement these covenants. (*Id.* § 8.)

For several years after starting employment with Miner, Nerby worked in roles that had varying, but not heavy, levels of direct or indirect customer-facing responsibilities and access to information about sales strategies, customer lists, or other confidential customer information. (Compl. ¶¶ 6, 24; Higgins Decl. ¶¶ 9, 20, 22; Nerby Decl. ¶¶ 12–21.) Then, in May 2024, Miner unexpectedly, and effective immediately, terminated Nerby's employment as part of a reduction in force. (Compl. ¶ 26; Nerby Decl. ¶¶ 22, 23.) Upon his termination, Nerby returned his company-issued electronic devices, access card, and credit cards and threw away any paper documents he had related to Miner in his home. (Nerby Decl. ¶ 24.)

Shortly after termination, Lance Higgins (Nerby's former manager at Miner) contacted Nerby to see if he would consider working for one of Miner's subcontractors to train the subcontractor's employees on how to install certain products Miner sells and services. (*Id.* ¶ 26; Higgins Decl. ¶ 23.) Based on Higgins's statements, Nerby believed he was free to engage in sales, maintenance, and repair services related to commercial garage doors and warehouse accessories following his termination. (Nerby Decl. ¶ 27.)

C.     **Nerby Forms WiSP**

On May 22, 2024, Nerby formed WiSP Industrial Service LLC (WiSP) in Wisconsin with one of his former Miner colleagues, Paul Nordeen.[4] (*Id.* ¶ 29; Compl. at Ex. 6.) According to Nerby, WiSP's business model varies from Miner's in size and scope. For example, WiSP has two employees with only a dozen jobs in Minnesota whereas Miner has hundreds of thousands of employees throughout thirty-five states. (Nerby Decl. ¶¶ 35–36.) In addition, unlike Miner, WiSP "does not solicit the sale or installation [of] loading docks or other large pieces of warehouse equipment." (*Id.*)  Finally, while "most of [Miner's] maintenance and repair-related services are focused on commercial garage doors manufactured by Rytec, Inc.," WiSP services "equipment made by other manufacturers that is not typically sold, installed, or serviced by [Miner.]" (*Id.*).

Shortly after Nerby founded WiSP, Miner heard directly from at least four of its customers and one of its vendors that WiSP, via Nerby, had reached out to them either by phone call, text message, e-mail, or in person. (Compl. at Exs. 7–12; Higgins Decl. ¶ 6.) For example, representatives of Rytec, an "important vendor[] and manufacturer[]" with which Miner "ha[s] an understanding whereby Miner is the exclusive distributor of parts for Rytec-branded doors . . . in the upper Midwest" reached out to Miner to report that Nerby had represented he "ha[s] been getting customers right and left that have rytec."

---

[4] Nordeen and WiSP are currently defendants in a nearly identical suit, which Miner filed in the Western District of Wisconsin on July 10, 2024. *See Miner, Ltd. v. Nordeen et al.*, No. 3:24-cv-00463-jdb (W.D. Wis.) In that case, the court denied a motion for a temporary restraining order without prejudice on grounds that, among other things, the court was not "persuaded that Miner faces such immediate and imminent harm that it must grant emergency relief." (Doc. No. 31 at Ex. 1.)

5

(Compl. ¶¶ 30, 31, Ex 7.)  Rytec also informed Miner that Nerby had called a Wisconsin Rytec dealer looking for parts and, during the conversation, stated that he had picked up an account with a car-dealership group because the customer did not wish to work with Miner anymore.  (*Id.* at Ex. 11.)

Miner also heard from a car-dealership customer and a food-bank customer that Nerby had stopped by their places of business to inform them that they could call him for service.  (*Id.* at Exs. 8, 9.)  Another customer informed Miner that Nerby emailed to tell them that "[WiSP is] here for all your Warehouse needs."  (*Id.* at Ex. 12.)  Another customer, the Fish Guys, sent Miner an email to tell them that it had engaged WiSP to repair an issue with a freezer door that Miner had previously unsuccessfully attempted to fix, that it would not pay Miner's bill for its attempted repair, and that it would be getting quotes for repairs and upgrades from both WiSP and Miner in the future.  (*Id.* at Ex. 10.)

Miner ultimately discovered that WiSP had done work or provided quotes for seventeen "current customers of Miner for which Nerby had responsibility during his employment with Miner, and about which Nerby had confidential, proprietary, and/or trade secret information of Miner."  (Higgins Decl. ¶ 28.)  Miner also discovered that Nerby had discussions with Rytec about potentially working with Rytec but that those discussions did not lead to any work between WiSP and Rytec in Minnesota.  (Doc. No. 37, Ex. A at 18.)

D. **This Action**

In July 2024, Miner filed this action, asserting claims against Nerby for alleged violations of the Defend Trade Secrets Act (DTSA) and the Minnesota Uniform Trade Secrets Act (MUTSA), for breach of contract, for tortious interference with contract, for

tortious interference with prospective economic advantage, for breach of duty of loyalty, and for unjust enrichment. (*Id.*) Miner also filed a motion for injunctive relief. (Doc. No. 6; Doc. No. 21.) In it, Miner seeks an order restraining and enjoining Nerby, and others acting in concert with him (e.g., WiSP and Nordeen), from "possessing, disseminating, disclosing, copying, transmitting, using, secreting, or otherwise accessing any confidential and proprietary information which is the property of Miner, including, without limitation, customer and supplier information and lists" (Doc No. 19 ¶ 1), "owning, financing, or serving as an employee, principal, agent, shareholder, partner, consultant, advisor, manager, member or director of WiSP or other Competing Business in Minnesota, North Dakota, Wisconsin and Iowa" (*id.* ¶ 5), "soliciting business from Miner customers or suppliers" (*id.* ¶ 6), and "soliciting and/or poaching Miner's employees." (*Id.* ¶ 7.) Miner also seeks to require Nerby to "return any company property or information deemed to be the confidential and proprietary property of Miner in [his] possession, custody, or control, including, but not limited to, customer and supplier lists and data." (*Id.* ¶ 2.)

## DISCUSSION

Miner asks the Court to issue a preliminary injunction "to halt Nerby's conduct." (Doc. No. 18 at 2.) Because Miner has not shown that it has or will suffer irreparable harm absent injunctive relief, the Court denies the motion.

When considering whether to grant a motion for a preliminary injunction, courts consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public

interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981); *see Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) ("[T]he standard for analyzing a motion for a temporary restraining order is the same as a motion for preliminary injunction."). No one factor is determinative and courts "should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (quotation omitted). The burden of establishing every factor belongs to the movant. *E.g.*, *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

The Court starts and ends its analysis on the irreparable-harm factor because "[f]ailure to show irreparable harm is an independently sufficient ground upon which to deny [injunctive relief]." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016). "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Id.* at 1039. Irreparable harm can be either "actual or threatened" harm. *St. Jude Med., Inc. v. Carter*, 913 N.W.2d 678, 684 (Minn. 2018). However, alleged harm that is only possible or merely speculative is not enough. *Graham v. Webb Int'l v. Helene Curtis Inc.*, 17 F. Supp. 2d 919, 924 (D. Minn. 1988). To carry its burden on this factor, Miner must show that "irreparable injury has resulted, or will in all probability result" from Nerby's alleged breach of the Agreement and alleged misappropriation of trade secrets. *St. Jude Med.*, 913 N.W.2d at 684. In addition, Miner must "show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. Fed. Commc'ns*

8

*Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996); *Medtronic, Inc. v. Ernst*, 182 F. Supp. 3d 925, 934 (D. Minn. 2016).

Miner urges, with citation to Minnesota state caselaw, that the Court can and should infer irreparable harm simply by virtue of Nerby's post-employment contact with Miner's customers. (Doc. No. 18 at 16–17 (citing *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 452 (Minn. App. 2001).) However, "inferring irreparable harm from the breach of a valid restrictive covenant is a *Minnesota* procedural doctrine developed and applied by *Minnesota* courts in deciding whether to grant injunctive relief under the *Minnesota* Rules of Civil Procedure." *Perficient, Inc. v. Craft*, No. 24-CV-2425 (PAM/DLM), 2024 WL 3356977, at *3 (D. Minn. July 10, 2024) (quotation omitted) (emphasis in original). As a result, it does not apply here because Miner elected to bring its claims in federal court. *See id.*; *Moeschler v. Honkamp Krueger Fin. Servs., Inc.*, No. 21-CV-0416 (PJS/DTS), 2021 WL 4273481, at *12–13 (D. Minn. Sept. 21, 2021) ("[T]he Minnesota presumption—which excuses plaintiffs from showing *actual* irreparable harm, as *Dataphase* and a legion of other Eighth Circuit decisions require—does not apply in federal court.").

In federal court, "[w]here a former employee violates a valid covenant not to compete, the Court *may* infer irreparable harm to the employer." *Medtronic, Inc. v. Camp*, No. 02-CV-285 (PAM/JGL), 2002 WL 207116, at *2 (D. Minn. Feb. 6, 2002) (emphasis added). However, such an inference is not compulsory; the Court need not make such an inference where the evidence does not support that the alleged harm is indeed "certain and great and of such imminence" that urgent equitable relief is required. *See, e.g.*,

9

*Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706–07 (8th Cir. 2011); *Ernst*, 182 F. Supp. 3d at 934–35 (declining to infer irreparable harm from former employee's breach of non-compete where plaintiff did "not sufficiently describe any specific, certain, and imminent harms requiring equitable relief").

The Court cannot infer irreparable harm based on the evidence that Miner has brought forward. At most, Miner has provided evidence of the following: (1) Nerby, through WiSP, has engaged in work that appears to be competitive with the work Miner does; (2) Nerby has made contact with several of Miner's customers, including by providing unspecified quotes and doing unknown work for seventeen of Miner's customers; (3) Nerby has represented to Rytec, with which Miner had "an understanding whereby Miner is the exclusive distributor of parts for Rytec-branded doors" that he was working with customers that have Rytec doors; (4) Nerby has unsuccessfully attempted to do business with Rytec in Minnesota; (5) Nerby has attempted to purchase parts from a Rytec dealer in Wisconsin; and (6) one customer, the Fish Guys, gave work to Nerby after an unsatisfactory service experience with Miner, but will continue to take quotes from Miner. (Compl. ¶¶ 30, 31, Exs. 7–12; Higgins Decl. ¶¶ 6, 28; Doc. No. 37, Ex. A at 18.)

This evidence, taken together, does not amount to harm that is so "certain and great and of such imminence" that immediate and extraordinary relief is necessary. *Iowa Utils. Bd.*, 109 F.3d at 425. Though Nerby has admittedly made contact with numerous Miner clients, Miner has not provided evidence concerning these contacts that could enable the Court to adequately evaluate their significance. For example, Miner declares that it is a market leader, but has provided no information to the Court about how many customers it

10

has in the relevant market, whether the customers with which Nerby made contact (aside from Rytec) are major customers or otherwise occupy a consequential degree of Miner's overall business, or even the nature of the services Nerby performed for these customers. It does seem apparent that Rytec's relationship with Miner is significant to Miner, but Miner does not argue or come forward with evidence suggesting this relationship is at risk of diminution by Nerby's conduct. Instead, Miner and Rytec's relationship remains protected by an agreement and Rytec has repeatedly informed Miner of Nerby's conduct. Likewise, although Nerby has made unsuccessful attempts to get Miner's customer's business, the fact that these attempts were not successful tends to undercut Miner's argument that its relationship with those customers has been harmed. Finally, with respect to the Fish Guys, Miner has arguably offered more evidence of diminished customer good will. However, the Court still cannot conclude that diminution of its goodwill was the result of Nerby's conduct alone; rather, Miner's inability to repair the freezer door to the Fish Guys' satisfaction contributed—at least in part.

Last, Miner also urges that the Court must find that it has satisfied the *Dataphase* irreparable harm factor because the Agreement itself states that any breach necessarily and irreparably damages Miner:

> It is recognized and acknowledged by the Employee that a breach of any of the covenants contained in this Agreement will cause irreparable damage to the Company and its goodwill
> . . . .

(Agmt. § 8; Doc. No. 18 at 17.) The Court, however, remains unconvinced. Such agreements "avowing irreparable harm neither bind a federal court nor relieve a party of

11

its duty to demonstrate *actual* irreparable harm." *Perficient, Inc.*, 2024 WL 3356977, at *4 (quotation omitted) (emphasis in original). Absent demonstrable and actual irreparable harm, this contract clause does not compel the Court to grant Miner its requested relief.

"Failure to show irreparable harm is an independently sufficient ground upon which to deny [injunctive relief]." *Grasso Enters.*, 809 F.3d at 1040. Based on the parties' submissions to the Court, Miner has not established that it has suffered or will suffer irreparable injury, and, therefore, injunctive relief is not necessary at this time.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT Plaintiff Miner, Inc.'s Motion for a Temporary Restraining Order (Doc. No. 21) is DENIED.

Dated:  October 24, 2024                     /s/ *Jeffrey M. Bryan*
                                             Judge Jeffrey M. Bryan
                                             United States District Court